# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

BARBARA ALLEN, ET AL.

CIVIL ACTION

VERSUS

17-709-SDD-RLB

WRIGHT NATIONAL FLOOD
INSURANCE SERVICES, LLC

## RULING

## I.    GENERAL ALLEGATIONS AND PROCEDURAL BACKGROUND

The present matter came before the Court for a bench trial on August 12, 2021. This trial was conducted via Zoom due to the COVID-19 pandemic and in accordance with the Cares Act.[1]   The Court has considered the Parties' pre-trial and post-trial submissions, the evidence admitted at trial via documents and sworn testimony, and the arguments presented.  The Court finds that Plaintiffs have failed to satisfy their burden of proof that they are entitled to an additional $38,693.72 to replace sheathing.

This case arises out of the catastrophic Great Flood of 2016, which caused damage to thousands of homes in the Middle District of Louisiana.  Plaintiffs Barbara and Robert Allen ("Plaintiffs" or "Plaintiff"),[2] homeowners whose home sustained serious damage due to this flood, were insured by Defendant Wright National Flood Insurance Services, LLC ("Defendant").  Plaintiffs and Defendant executed an insurance contract governed by the Standard Flood Insurance Policy ("SFIP"), and Plaintiffs claim Defendant breached this contract by failing to pay the full amounts owed for flood coverage.  The

---

[1] Coronavirus Aid, Relief, and Economic Security Act, § 15002(b)(1) & (b)(3)(A).
[2] As Barbara Allen is the only Plaintiff that testified at trial in this matter; any reference to Plaintiff in the singular refers to Barbara Allen.

sole issue for trial is whether Defendant sufficiently paid Plaintiffs for the flood damage done to the home's sheathing.  Plaintiffs claim Defendant's failure to pay violates the SFIP, the United States Government's National Flood Insurance Program ("NFIP") Claims Manual, and other guidance issued by the Federal Emergency Management Agency ("FEMA").  Defendant contends Plaintiffs have been fully compensated for all covered flood damages resulting from this flood by the $185,386.94 it previously paid. Wright maintains Plaintiffs cannot prove that she is entitled to more money for sheathing.

It is undisputed that this Court has both federal question and subject matter jurisdiction pursuant to 42 U.S.C. § 4072 and 28 U.S.C. § 1331.

## II.    PRIOR *DAUBERT* CHALLENGE TO PLAINTIFFS' EXPERT

Tommy Tompkins ("Tompkins") is Plaintiffs' proffered expert in this case.  Prior to this bench trial, Defendant moved to exclude Tompkins, who was designated as an expert on behalf of the plaintiff in a similar flood case, *Jarell v. Wright National Flood Insurance Company*.[3]  The matter before the Court was consolidated with *Jarell* for discovery purposes.[4] This Court denied the motion to exclude Tommy Tompkins in *Colar v. Imperial Fire & Casualty Insurance Company*,[5] finding:

> Another division of this Court has recently denied an identical Motion *in Limine* to exclude Tompkins.  For similar reasons, this Court reaches the same conclusion.
>
> Therefore, this Court adopts the well-reasoned opinion of Judge deGravelles in *Albert Anderson vs Allstate Insurance Company*[6] and the undersigned's recent opinion in *Corley v. Gulfstream Property and Casualty Insurance Company*.[7]

---

[3] Civil Action 17-301-SDD-RLB, Rec. Doc. No. 163.
[4] *Id.* at Rec. Doc. No. 16.
[5] Civil Action 18-207-SDD-SDJ, Rec. Doc. No. 55, p. 2 (citations omitted)
[6] *Id.* (quoting Civil Action 17cv00597-JWD-SDJ, Rec. Doc. No. 218).
[7] *Id.* (quoting Civil Action 17cv00535-SDD-RLB, Rec. Doc. No. 74)

This Court explained in *Corley*:

> The gravamen of Gulfstream's argument is that Tompkins' opinions are unreliable because his reports are cookie-cutter, and his opinions are not supported by site inspections and fail to account for repairs that have been made. Notably, these cases are set for bench trials. As such, the dangers of juror confusion are not present. The Court can discern and credit evidence of repairs that have been made. Likewise, the Court can evaluate the claim file materials relied upon by the insurer's adjusters and Tompkins for applicability and relevance to the loss in question.[8]

Because the Court's Ruling in *Jarrell* applies to this matter based on the consolidation, it was predetermined that Tompkins would be allowed to give expert testimony at trial. Nearly identical claims about Tompkins were made in *Smiley v. New Hampshire Insurance Company*,[9] wherein another section of this Court denied the motion to exclude Tompkins, stating:

> While these inconsistencies will undoubtedly be the subject of vigorous cross examination at trial and may well have an impact on the credibility of this witness and the weight to be given to his evidence, they are not grounds for excluding the testimony altogether. "Matters left for the jury's consideration include the alleged miscalculations, erroneous assumptions, and inconsistencies that plaintiffs object to." *Imperial Trading Co.*, 2009 WL 2356292, at *3 (citing *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 935 (W.D. Wis. 2007)) ("the alleged errors and inconsistencies are grounds for impeaching the credibility of the experts and the reliability of their ultimate findings; however, mistakes and miscalculations are not grounds for excluding evidence." (citing *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786)). *See also Sexton*, 2020 WL 5292046, at *6; *Ford v. State Farm Fire & Cas. Co.*, No. 17-1767, 2019 WL 8752340, at *3 (M.D. La. July 9, 2019) (deGravelles, J.); *Alonso v. Westcoast Corp.*, No. 13-563, 2015 WL 9076404, at *4 (M.D. La. Dec. 16, 2015) (Jackson, J).[10]

---

[8] No. 17-535-SD-RLB, 2021 WL 325714, at * 2 (M.D. La. Feb. 1, 2021).
[9] No. 17-cv-1094-JWD-EWD, 2021 WL 292449 (M.D. La. Jan. 28, 2021).
[10] *Id.* at *13.

The Court's credibility findings, findings of fact, and conclusions of law are set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## III.  SUMMARY OF RELEVANT TRIAL TESTIMONY

Plaintiff testified that she contacted multiple contractors to give a bid for exterior sheathing replacement, but no contractor would give a bid to complete the exterior sheathing repair method "[b]ecause they said that it would exceed the Policy Limits."[11] Plaintiff also testified that she asked several contractors to provide a bid to repair the sheathing "without removing the brick walls, and they didn't have the abilities or the know how to do that."[12]  None of these contractors were called to testify at trial.

Plaintiff identified a small section of exterior sheathing behind the fireplace which had to be replaced because there was a brick wall on both sides of the sheathing, and the sheathing could not be accessed to disinfect it from mold growth.[13]

Tommy Tompkins ("Tompkins") was called by Plaintiffs to give expert testimony in the field of "flood insurance adjusting."[14]  In *Corley*, the Court noted:

> The Court finds that Tompkins is qualified to render opinion testimony on loss adjustment by virtue of his designation as a "NFIP Authorized Adjuster who maintains a Flood Control Number (FCN) issued by the NFIP Bureau & Statistical Agent on behalf of FEMA," 19 years' experience adjusting residential property claims, including floods, his experience of handling approximately 2500 claims as a field adjuster, and 1,500 claims as an inside desk adjuster.[15]

---

[11] Rec. Doc. No. 42, Trial Transcript, p. 21, lines 24-25.
[12] *Id.* at p. 22, lines 12-14.
[13] *Id.* at pp. 23-24; p. 25, lines 1-7.
[14] *Id.* at p. 57, lines 8-11.
[15] *Corley*, 2021 WL 461587 at *1 (internal citations omitted).

The flood damage repair estimate for Plaintiffs' property was completed by ATA Consulting. Tompkins is the owner/partner and quality control expert of ATA Consulting.[16]

By prior agreement, Defendant adopted and incorporated the *voir dire* of Tompkins' expert qualifications in *Jerel Hatcher v. Allstate Insurance Company*.[17] Defendant also asked a few more questions touching on Tompkins' qualifications in the field offered.  Tompkins admitted that he had never performed any repairs on a flood damaged house;[18] that he had no training in construction methodologies or building materials;[19] that he did not serve as a flood adjuster in this case, and he did not perform the functions that a flood adjuster normally would;[20] he did not physically inspect Plaintiffs' property or analyze this property for any damage prior from flood;[21] and he did not write the Estimate for this property.[22]

Following these admissions, Defendant objected to the tender, arguing Tompkins' testimony would fall outside the scope of his expertise.[23]

The Court accepted Tompkins in the offered field, for reasons previously given, but also stated that it would consider the *Hatcher voir dire* along with the additional *voir dire* in this case "in terms of the weight to be afforded to Mr. Tompkins' testimony."[24]

Tompkins testified that "the program [he] used to estimate brick removal and brick replacement is … Xactimate."[25] Tompkins' report states that:

---

[16] Rec. Doc. No. 42, p.72, lines 2-7.
[17] Case number 3:17-cv-00898, Rec. Doc. No. 62, at 78–85.
[18] Rec. Doc. No. 42, p. 58, lines 14-16.
[19] *Id.* at p. 59, lines 2-4.
[20] *Id.* at p. 60, lines 5-10.
[21] *Id.* at p. 60, lines 11-18.
[22] *Id.* at p. 60, lines 19-21.
[23] *Id.* at p. 60, lines 23-24.
[24] *Id.* at p. 61, lines 4-8.
[25] *Id.* at p. 66, lines 2-4.

Xactimate is part of Xactware Solutions. Xactware Solutions provides computer software solutions for professionals involved in estimating all phases of building and repair. Today 22 of the top 25 property insurance companies in the U.S. and 10 of the top 10 Canadian insurers use Xactware property insurance claims tools. Xactware features software solutions for every phase of a building's life: from remodeling to totally replacing a building, from determining the cost of rebuilding a structure to preserving and repairing a home.[26]

Tompkins concluded that the exterior repair method is the only proper method of replacing the sheathing on Plaintiffs' home.[27]

On cross-examination, Tompkins admitted to numerous errors in his report and the Estimate. Tompkins admitted that the specific material type contained in the Estimate for replacement of the sheathing was incorrect.[28] Tompkins conceded that the estimated square foot numbers used to calculate the cost of the brick and sheathing replacement were inaccurate because they included sheathing behind vinyl siding, which did not exist, areas where plywood corners were installed, which did not require replacement, and did not account for door or window openings.[29]

Tompkins admitted that he did not know whether the exterior walls were 9 or 8 feet high, but the Estimate considered the exterior walls to be 9 feet high.[30] Tompkins agreed that using a 9-foot wall in reaching the Estimate would render the square foot number for the brick inaccurate if the walls were, in fact, 8 feet.[31] Plaintiffs presented no evidence to support the consideration of a 9 ft exterior wall in reaching the Estimate.

---

[26] Plaintiffs' Exhibit 5, p. 3.
[27] Rec. Doc. No. 42, p. 70, lines 7-24.
[28] *Id*. at p. 78, lines 8–13.
[29] *Id*. at p. 83, lines 19–25; p. 88, lines 8–11; p. 91, lines 9–13, pp. 91; line 20 – p. 92, line 10; p. 100, lines 1–25.
[30] *Id*. at p. 85, lines 11–19; p. 86, lines 11–13.
[31] *Id*. at p. 86, lines 18–21.

Tompkins testified that there was no sheathing behind the vinyl siding, and he admitted that the Estimate would be incorrect if there was no sheathing behind the vinyl siding.[32] The need to replace house wrap for this property was also factored into reaching the Estimate.  However, Tompkins admitted that he only speculated that house wrap had been present at Plaintiffs' home.[33]

In Tompkins' expert report, under the heading "Methodology," Tompkins writes:

> We visited the property at 25512 Plantation Ave, Denham Springs, LA 70726 in 2017.  During that visit we made a thorough inspection of the Property. We inspected the exterior elevations, windows, doors, interior, and foundation. We looked for evidence of damage that was the result of rising flood waters from the 2016 Baton Rouge Flood Event. All available documentation and policy coverage was reviewed before beginning the inspection process. We took extensive pictures documenting the materials used to construct this home. We took measurements of all relevant areas of the Property affected by the 2016 Baton Rouge Flood Event.[34]

Although Tompkins' report states above that "[w]e took extensive pictures," when asked if he had any pictures taken by ATA for this property, he responded, "I do not."[35]

---

[32] *Id.* at p. 91, lines 24-25 – p. 92, lines 1-10
    Q    Okay and I think you already testified that there was no sheathing behind the vinyl siding areas.  Correct?  I didn't hear your answer.
    A    On the sheathing? You're referring to the sheathing?
    Q     Yes .
    A    It could be.  If there is no sheathing installed behind the vinyl siding, then that number is not accurate.
[33] *Id.* at p. 92, lines 11-24.
    Q    Line item 9A and 9B, remove and replace house wrap, you've never seen any house wrap at this house, correct?
    A    I haven't been to this house.
    Q    Haven't seen it in any photographs.  Correct?
    A    That is correct.
    Q    So you're assuming that the house wrap even exists. Correct?
    A    Whether or not it exists, you still wouldn't be able to see it unless you took the brick veneer down.
    Q    So you're speculating. Correct?
    A    Correct.
[34] Plaintiff's Exhibit 5, p. 3.
[35] Rec. Doc. No. 42, p. 113, lines 2-5.

Although Tompkins' report states above that "[w]e took measurements," when asked if he had any measurements taken by ATA for this property, he responded, "I have no written measurements, no."[36] All pictures and measurements submitted by Plaintiffs as exhibits in this matter appear to have been prepared by Colonial's adjuster, Jeff Riddle, on behalf of Defendant. Tompkins admitted that his report contains several stock paragraphs under the heading "Observations" that are not tailored to a particular property.[37]

Counsel for Plaintiffs declined to re-direct Tompkins, and the errors and admissions discussed above went uncontroverted.[38]

Defendant called John Crawford ("Crawford"), a licensed professional engineer and general contractor self-employed by Crawford Engineering, LLC, to provide expert testimony in the field of forensic and structural engineering, construction, and contracting and estimating the cost to repair flood-damaged properties.  After setting forth Crawford's educational background, licenses, and professional experience and credentials, the Court accepted Crawford in the tendered field without objection from Plaintiffs.[39]

In evaluating Plaintiffs' damage and cost of repair, Crawford testified that he considered the following:

> The October 4, 2016 Engineering Report With Photograph By Forensic Consulting Group; The October 20, 2016 Valuation Report And Estimate With Photographs By Colonial Claims For Wright National Flood Insurance Company; July 16, 2017 Estimate By Pandit Law Firm; December 27, 2019 Deposition Transcripts Of Robert Allen And Barbara Allen; Undated Estimate Summary Spreadsheet by ATA Consulting; Undated ATA Report Prepared by Thomas -- Tommy Tompkins; Interim, Status, Upload for Po Approval and Final Reports by Colonial; Various Invoices, Proposals, Quotes, Contractor -- Contracts -- sorry --Agreements, Checks and Other Proofs Of Payment And Repair Documentation; Plaintiffs' Disclosure and

---

[36] *Id.* at p. 113, lines 6-8.
[37] *Id.* at p. 113, lines 9-20.
[38] *Id.* at p. 116, lines 17-18.
[39] *See generally*, Rec. Doc. No. 42, pp. 117-125.

Discovery Documents; Plaintiff -- I'm sorry -- FEMA Related Documents such as Proof Of Loss, Preliminary and Final Reports.[40]

Crawford testified that there is an appropriate and reasonable interior repair method that he utilized to estimate the cost to repair the sheathing from the interior.[41] Crawford consulted with other contractors, engineers, and the LSU Agricultural Center ("LSU Ag. Center") in creating and confirming the feasibility of this methodology.[42] Crawford also referred to the NFIP Claims Manual, which provides that "an appropriate and reasonable repair [of sheathing] can generally be made without demolishing the exterior surface of the building unless it is economically or physically impractical to do so."[43]

On cross-examination, Crawford admitted that the LSU Ag. Center recommendations for repairing flood-damaged material also provide that "[t]he best practice is to remove the brick veneer and brick ties, replace sheathing from the exterior with plywood or other flood-hardy material, then install new brick veneer, siding or other finish. … This [repair] is costly, but offers the best and lowest risk restoration."[44]  Further, Crawford admitted on cross-examination that the LSU Ag. Center Publication also states that the interior sheathing repair method proposed is an "alternative restoration approach" that is "not standard building practices" and is "used when a homeowner can't afford to remove and replace the brick veneer."[45]

---

[40] *Id*. at p. 127, line 18 – p. 128, line 9.
[41] *Id*. at p. 137, line 6 – p. 148, line 18.
[42] *Id*. at p. 154, line 16 – p. 155, line 17.
[43] Def. Exhibit 31, p. 253; Rec. Doc. No. 42, p. 155, line 17 – p. 157, line 19.
[44] Rec. Doc. No. 42, p. 152, lines 6-16.
[45] *Id*. at p. 152, lines 17-25; p. 153, lines 1-25.  The LSU Ag. Center Publication was not entered into evidence but was viewed and discussed via screen sharing on Zoom.  The Court took judicial notice of this public document.  While Crawford testified that he did not agree with the LSU Ag. Center's statements in these paragraphs, he admitted that the publication did contain these paragraphs, as written.  *Id*. at p. 153, lines 17-25 – p. 154, line 1.

Crawford testified that "the exterior water height was 65 inches, and the interior water was approximately 62 inches."[46]  Crawford's opinion was confirmed by examining Defense Exhibit 5, Bates page 0920, a photograph taken by Riddle. While Crawford refuted Tompkins' speculation that the exterior walls were 9 ft tall, he also addressed the fact that the ATA Estimate included vinyl costs which would have covered all the doors and windows on the exterior of the house.[47]  Plaintiffs ultimately conceded that vinyl siding was no longer part of their claim.[48]

The Court did not allow any attempts by Defendant to elicit testimony or evidence regarding what prior reimbursements were spent on before providing an additional payment to reimburse an unrepaired item based on another section of this Court's ruling in *Nguyen v. Hartford Underwriters Insurance Company*.[49] The Court in *Nguyen* ruled that, reading the SFIP *in pari materia* with the Claims Manual, an insurer may not "require

---

[46] *Id.* at p. 128, lines 13-15.
[47] *Id.* at p. 135, lines 23 – p. 136, line 23:

    Q      What other mistakes did you notice in the Pandit Law Estimate with regards to the vinyl siding?
    A      The vinyl siding is – he's allowing to remove and replace the vinyl siding, which is unnecessary.  It's not flood damaged.  He also removes and replaced the cladding at the front of the house, which was not damaged.  It does not need to be removed or replaced.  That's the clapboard.  When I say cladding, it's the clapboard at the front of the house.
    Q      You mentioned the linear foot.  How many square feet are we talking about for vinyl siding?
    A      Well, we have a hundred and thirty-five linear feet.  What's important is the Pandit Law Firm allows for nine feet.  It's actually an eight-foot wall.  We can verify that through photographs.  So it would be a hundred and thirty-five times eight, which we – a thousand eighty; one thousand zero-eight-zero square feet.  That's if I –
                            …
    A      If I cladded the entire wall with vinyl and I didn't cut out the windows, I didn't cut out the doors, I didn't – I don't need to put all that vinyl over door, especially if I'm installing it brand new.  I'm not going to buy all these extra materials I don't need.

[48] *Id.* at p. 87, line 22 – p. 88, line 11; p. 91, lines 4-8; 169, 166, lines 16-20.
[49] 514 F. Supp. 3d 831 (M.D. La. 2021).

proof of how a prior reimbursement was spent before providing an additional payment to reimburse an unrepaired item."[50] The Court explained:

> The Claims Manual removes any ambiguity regarding whether an insurer may require proof of how a prior reimbursement was spent before providing an additional payment to reimburse an unrepaired item: the insured "is not required to prove how they spent funds previously paid on the same claim," and the insurer "may not deny requests for additional payment solely because the policyholder did not provide evidence that all amounts previously paid on the claim . . . were spent to repair or replace covered flood damage."[51]

The Court now turns to the Findings of Fact and Conclusions of Law reached in this case.

## IV.    FINDINGS OF FACT

### A.    Stipulated Facts

The Parties stipulated to the following facts by written submission prior to trial.[52]

1.    Defendant is a Write-Your-Own ("WYO") Program carrier participating in the United States Government's National Flood Insurance Program pursuant to the NFIA, as amended.

2.    Defendant, in its capacity as a Write-Your-Own Program carrier, issued SFIP No. 17 1150564875 05 (the "Policy") to provide flood insurance for the property located at 25512 Plantation Ave., Denham Springs, LA 70726.

3.    At all times relevant, Plaintiffs were and are the owners of the property located at 25512 Plantation Ave., Denham Springs, LA 70726.

4.    The Policy had effective dates from September 15, 2015 to September 15, 2016.

---

[50] *Id.* at 845.
[51] *Id.* (quoting the Claims Manual).
[52] *See* Rec. Doc. No. 24, pp. 3-5.

5.      The policy provided Coverage A (Building) limits of $250,000.00 subject to a $2,000.00 deductible.

6.      No disputes exist under Coverages B, C, or D.

7.      On or about August 13, 2016, the Subject Property experienced a flood loss, causing damage to the building (the "August 2016 flood loss").

8.      On or about August 13, 2016, the Subject Property was inundated with approximately 62" of floodwater on the interior and sustained approximately 65" of floodwater on the exterior. All floodwater had exited the building after approximately 48 hours.

9.      Plaintiffs reported their August 2016 flood loss on August 15, 2016.

10.     Defendant assigned, as a matter of courtesy only, Jeff Riddle ("Riddle"), an independent adjuster with Colonial Claims ("Colonial") to inspect the Subject Property and prepare a damage estimate for Plaintiffs' August 2016 flood loss.

11.     Riddle inspected and photographed the Subject Property on August 19, 2016.

12.     Barbara Allen executed an Advance Payment Request on August 20, 2016 in the amount of $45,000.00.

13.     Wright issued a check in the amount of $45,000.00 on September 7, 2016 to the Plaintiffs, which was received by the Plaintiffs and negotiated.

14.     Riddle prepared an estimate for Building damages (Coverage A) dated October 20, 2016 in the total amount of $185,386.94, after accounting for non-recoverable depreciation and the policy deductible.

15.     Robert Allen executed a Proof of Loss in accordance with the estimate on October 24, 2016.

16.    Wright issued a check in the amount of $125,825.81 on November 14, 2016 and a check in the amount of $14,561.13 (for recoverable depreciation) on November 16, 2016 to the Plaintiffs, which were received by the Plaintiffs and negotiated.

17.    Plaintiffs are entitled to Replacement Cost Loss Settlement pursuant to the Loss Settlement Clause. 44 C.F.R. pt. 61, app. A(1), art. V(2).

18.    All necessary Policy premiums were paid, and the Policy was in full force and effect on the date of Plaintiffs' August 2016 flood loss.

19.    FEMA extended the 60-day Proof of Loss deadline for claims related to the August 2016 flood event until December 31, 2017.

20.    The Parties are not aware of any prior flood losses at the Subject Property.

21.    Defendant has paid $185,386.94 to Plaintiffs under Coverage A of the Policy (after accounting for non-recoverable depreciation and the $2,000.00 deductible) for building damages related to the August 2016 flood event.

22.    Plaintiffs submitted a Proof of Loss and estimate to Defendant on July 21, 2017 via electronic mail.

23.    Defendant issued a written, partial denial of Plaintiffs' flood claim on July 24, 2017.

**B.    Court's Findings of Fact**

The following findings of fact are supported by the credible evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and evaluated the credibility of the witnesses in making its finding.

24.    Plaintiffs established that there is damaged, unrepaired sheathing in their home that is covered by their insurance contract with Defendant.

25.    Tompkins is the owner/partner and quality control expert of ATA Consulting; the flood damage repair estimate for Plaintiffs was completed by ATA Consulting.[53]

26.    Tompkins has never performed any repairs on a flood damaged house;[54] he has no training in construction methodologies or building materials;[55] he has not served as a flood adjuster in this case, and he did not perform the functions that a flood adjuster normally would;[56] he did not physically inspect Plaintiffs' property or analyze this property for any damage prior from flood;[57] and he did not write the Estimate for this property.[58]

27.    The Xactimate program and software was used by Tompkins and/or ATA Consulting to estimate brick removal and replacement for Plaintiffs' home.[59]

28.    There were numerous errors in Tompkins' report that affected the final Xactimate Estimate.

29.    The specific material type contained in the Estimate for replacement of the sheathing was incorrect.[60]  The estimated square foot numbers used to calculate the cost of the brick and sheathing replacement were inaccurate because they included sheathing behind vinyl siding, which did not exist, areas where plywood corners were installed, which did not require replacement, and did not account for door or window openings.[61]

---

[53] Rec. Doc. No. 42, p. 72, lines 2-7.
[54] *Id*. at p. 58, lines 14-16.
[55] *Id*. at p. 59, lines 2-4.
[56] *Id*. at p. 60, lines 5-10.
[57] *Id*. at p. 60, lines 11-18.
[58] *Id*. at p. 60, lines 19-21.
[59] *Id*. at p. 66, lines 2-4.
[60] *Id*. at p. 78, lines 8–13.
[61] *Id*. at p. 83, lines 19–25; p. 88, lines 8–11; p. 91, lines 9–13, pp. 91; line 20 – p. 92, line 10; p. 100, lines 1–25.

30.    Crawford credibly refuted Tompkins's speculation that the exterior walls were 9 feet.  The Court finds that the exterior walls were 8 feet tall and utilizing the 9-foot measurement rendered the ATA Estimate erroneous.[62]

31.    There was no house wrap on Plaintiffs' home that needed to be repaired or replaced; thus, the inclusion of this repair rendered the Xactimate Estimate erroneous.[63]

32.    Plaintiffs presented no evidence at trial of photographs or measurements taken by Tompkins or ATA Consulting.[64]

33.    The pictures and measurements submitted by Plaintiffs as exhibits in this matter were prepared by Colonial's adjuster, Jeff Riddle, on behalf of Defendant.[65]

34.    The Court assigns little weight to Tompkins' testimony[66] based on demonstrated errors in his report and the ATA Estimate, both of which were rife with errors and speculation.[67]

35.    The Court finds that Crawford was generally more credible and persuasive than Tompkins.  However, the Court finds that the exterior sheathing repair method is

---

[62] *Id*. at p. 85, lines 11–19; p. 86, lines 11–13; 18-21.

[63] *Id*. at p. 92, lines 11-24.

[64] *Id*. at p. 113, lines 2-8.

[65] For example, Plaintiff testified that she remembered seeing "the guy" "not sent by Wright Flood," presumably from ATA, come inspect her property and take photographs and measurements.  Rec. Doc. No. 42, p. 28, lines 3-12.  While this fact was never established, assuming that ATA performed this inspection, Tompkins inexplicably could not direct the Court to any photographs or measurements in evidence.  *Id*. at p. 113, lines 2-8.

[66] The Court notes that Tompkins is the expert used by numerous plaintiffs in many of the 2016 Great Flood cases. Other sections of this Court have highlighted the problems with his testimony/reports, though some courts have found his testimony credible. *See Hatcher*, Case number 3:17-cv-00898, Doc. 62. This Court has no opinion on Tompkins' credibility in other cases and emphasizes that his testimony and conclusions must be evaluated on a case-by-case basis.

[67] "It is the province of this court to make credibility determinations, particularly as to witnesses in bench trials." *Pilgrim Missionary Baptist Church v. Church Mutual Insurance Co.*, No. 1:18-cv-00081, 2020 WL 6929995, at *5 (W.D. La. Nov. 24, 2020)(citing *Luwisch v. American Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (internal citations omitted)).

the most proper method to utilize in reaching an Estimate for Plaintiffs' home.  The LSU Ag. Center recommendations, relied upon by Crawford in drawing the contrary conclusion, state: "The best practice is to remove the brick veneer and brick ties, replace sheathing from the exterior with plywood or other flood-hardy material, then install new brick veneer, siding or other finish. … This [repair] is costly, but offers the best and lowest risk restoration."[68]  The LSU Ag. Center Publication also states that the interior sheathing repair method proposed is an "alternative restoration approach" that is "not standard building practices" and is "used when a homeowner can't afford to remove and replace the brick veneer."[69]

36.    Nevertheless, the Court finds that Plaintiffs failed to carry their burden of proving an entitlement to damages by a preponderance of the evidence.  While Plaintiffs established that they are entitled to damages for the damaged sheathing, Plaintiffs failed to carry their burden in proving, by a preponderance of the evidence, the actual amount of damages to which they are entitled based on specific evidence and not errors and speculation.

V.    **CONCLUSIONS OF LAW**

A.    **Standard Flood Insurance Policy**

37.    The Standard Flood Insurance Policy—Dwelling Form, a codified federal regulation found at 44 C.F.R. Pt. 61, Appx. A(1), is a flood insurance policy that is written by the federal government.

---

[68] Rec. Doc. No. 42, p. 152, lines 6-16.
[69] *Id.* at p. 152, lines 17-25; p. 153, lines 1-25.  The LSU Ag. Center Publication was not entered into evidence but was viewed and discussed via screen sharing on Zoom.  The Court took judicial notice of this public document.  While Crawford testified that he did not agree with the LSU Ag. Center's statements in these paragraphs, he admitted that the publication did contain these paragraphs, as written.  *Id.* at p. 153, lines 17-25 – p. 154, line 1.

38.    "The provisions of an insurance policy issued pursuant to a federal program must be strictly construed and enforced."[70]

39.    The SFIP insures against "direct physical loss by or from flood" to an insured dwelling, except as to property that is specifically "not covered" or "excluded."[71]

40.    Under federal common law, the SFIP is construed using standard insurance law principals according to its plain, unambiguous meaning to provide a uniform interpretation throughout the country.[72] "Nevertheless, ambiguities should be construed in favor of the insured and against the insurer."[73]

41.    As set forth in *Nguyen*, the Court is guided by "the requirement that a policy of insurance issued pursuant to a federal program must be strictly construed and enforced."[74] This Court in *Nguyen* also explained:

> Because insurance companies act as "fiscal agents" of the government under the National Flood Insurance Program, all policy awards deplete federally allocated funds. *In re Estate of Lee*, 812 F.2d 253, 256 (5th Cir. 1987). Therefore, "'not even the temptations of a hard case' will provide a basis for ordering recovery contrary to the terms of a regulation, for to do so would disregard 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'" *Forman v. Fed. Emergency Mgmt. Agency*, 138 F.3d 543, 545 [(5th Cir. 1998)] (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 420, 110 S. Ct. 2465, 110 L.Ed.2d 387 (1990)).[75]

---

[70] *Gowland v. Aetna*, 143 F.3d 951, 954 (5th Cir. 1998).

[71]    44 C.F.R. Pt. 61, Appx. A(1) Art. I.

[72] *Dean Blanchard Seafood, Inc. v. Acadian Ins. Servs.*, 616 F. Supp. 2d 612, 616 (E.D. La. 2008).

[73] *Id.* (citing *Rodgers v. Allstate Ins. Co.*, 2007 WL 1029480 at *4 (E.D. La. Mar. 30, 2007)(citing *Aschenbrenner v. U.S. Fidelity & Guar. Co.*, 292 U.S. 80, 84-85, 54 S.Ct. 590, 78 L.Ed. 1137 (1934)).

[74] *Nguyen v. Hartford Underwriters Ins.* Co., 514 F. Supp. 3d 831, 840 (M.D. La. 2021) (citing *Monistere v. State Farm Fire & Cas. Co.*, 559 F.3d 390, 394 (5th Cir. 2009) (quotation marks and alterations omitted)); *see also Cummings v. Fid. Nat. Indem. Ins. Co.*, 636 F. App'x 221, 224 (5th Cir. 2016) (same); *Garcia v. Wright Nat'l Flood Ins. Co.*, No. 4:18-CV-3956, 2020 WL 4677573, at *2 (S.D. Tex. May 19, 2020) (same).

[75] *Nguyen*, 514 F.Supp. 3d at 840.

42.   Pursuant to *Nguyen*, the Court rejects Defendant's argument that the SFIP's Replacement Cost Value Settlement provision applies and that Plaintiffs' failure to produce evidence of incurred costs as to items unrelated to the sheathing affects their right to recover for the unrepaired sheathing.

### B.   FEMA's National Flood Insurance Claims Manual

43.   42 U.S.C. §§ 4019 and 4072 "specifically and permissively authorize FEMA to implement regulations by which claims will be adjusted and paid for damaged property. The National Flood Insurance Program Claims Manual ("NFIP Claims Manual") is included among those regulations."[76]

44.   As a WYO Program Carrier, Defendant acts in a "fiduciary" capacity, 44 C.F.R. § 62.23(f), as the fiscal agent of the United States and at the expense of the United State Treasury, 42 U.S.C. § 4071(a)(1).

45.   The SFIP is to be read *in pari materia* with the NFIP Claims Manual to resolve coverage disputes.[77]

46.   FEMA intended the NFIP Claims Manual to incorporate Technical Bulletin 2 – Flood Damage-Resistant Materials Requirements for Buildings Located in Special Flood Hazard Areas in Accordance with the New National Flood Insurance Program ("Technical Bulletin 2").[78]

---

[76] *Id*. at 842 n. 10 (citing *White Hall on MS River, LLC v. Hartford Ins. Co. of the Midwest*, No. 13-cv-218, 2015 WL 1540436, at *2 (S.D. Miss. Apr. 7, 2015)).

[77] *Nguyen*, 514 F.Supp.3d at 838 (citing *e.g., Westmoreland v. Fid. Nat. Indem. Ins. Co.,* No. 13-cv-564, 2015 WL 3456634, at *3 (M.D. La. May 29, 2015) (deGravelles, J.) (reading the NFIP Claims Manual *in pari materia* with the SFIP to resolve scope of coverage dispute); *Davis v. Nationwide Mut. Fire Ins. Co*., 811 F. Supp. 2d 1240, 1248 n.8 (E.D. Va. 2011) (referencing the NFIP Claims Manual to clarify the SFIP's definition of "Post–FIRM Building")).

[78] *Nguyen*, 514 F.Supp.3d at 843 n. 11.

### C.    Coverage for Sheathing

47.    Perimeter wall sheathing ("sheathing") is building material that is nailed or screwed to the exterior frame of a house and acts as a home's external shell.[79]

48.    Sheathing is not among items excluded by SFIP Art. IV. (Property Not Covered) or Art. V. (Exclusions).[80]

49.    FEMA's NFIP Claims Manual "addresses sheathing expressly, providing specific guidance regarding whether and when an insurer must pay for sheathing."[81]

50.    The Replacement Loss Settlement Clause provides:

Replacement Cost Loss Settlement

The following loss settlement conditions apply to a single-family dwelling described in V.1.a. above:

> a. We will pay to repair or replace the damaged dwelling after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:
> (1) The building limit of liability shown on your Declarations Page;
> (2) The replacement cost of that part of the dwelling damaged, with materials of like kind and quality and for like use; or
> (3) The necessary amount actually spent to repair or replace the damaged part of the dwelling for like use.[82]

51.    Plaintiffs are eligible for Replacement Cost Loss Settlement for their August 2016 flood loss because (a) Plaintiffs resided at the Subject Property for at least 80% of the 365 days immediately preceding their August 13, 2016 flood loss, and (b) the

---

[79] *Id*. at 833-834.
[80] 44 C.F.R. Pt. 61, Appx. A(1), Arts. IV, V.
[81] *Nguyen*, 514 F.Supp.3d at 841.
[82] 44 C.F.R. Pt. 61, Appx. A(1), Art. VII(V)(2).

$250,000.00 in building coverage under Coverage A is the maximum amount of coverage permitted under the Act.[83]

52.    The Replacement Cost Loss Settlement Clause does not address a situation where the insured has received an initial payment, repaired the insured dwelling with the proceeds, and seeks an additional payment for damaged items that have not been repaired.[84] In such a scenario, the Replacement Loss Settlement Clause is ambiguous, and the SFIP is to be read *in pari materia* with the NFIP Claims Manual to clear up this ambiguity.[85]

53.    Plaintiffs need not prove how any prior claim payments were spent before the Defendant may pay to issue an additional payment to reimburse an unrepaired item such as the wall sheathing.[86]

54.    NFIP Insurers such as Defendant must evaluate requests for additional payments for unrepaired items using the same methods, procedures, and requirements used to evaluate the initial requests for payment.[87]

55.    The NFIP has no control over the policyholder's use of funds, and the policyholder may use the funds to repair the covered loss, repair losses that are not covered by the SFIP, or for any other use.[88]

56.    Defendant "may not deny [Plaintiffs'] requests for additional payment solely because [they] did not provide evidence that all amounts previously paid on the claim … were spent to repair or replace covered flood damage."[89]

---

[83] *Id.* at Art. VII(V); Rec. Doc. No. 24, p. 5, ¶ 13.
[84] *Nguyen*, 514 F.Supp.3d at 844.
[85] *Id.*
[86] *Id.* at 845.
[87] *Id.*
[88] *Id.*
[89] *Id.* at 844-45.

## VI.    CONCLUSION

The primary question before the Court is whether Plaintiffs carried their burden of proof as to the cost of replacement of damaged sheathing.  "The insured has the burden to prove that (1) the damages are covered under the SFIP (*i.e.*, that the damages constitute direct physical loss by or from flood) <u>and</u> (2) the amount of those damages.[90] As to the amount of damages, **failure to prove the specific, additional amount owed** under the SFIP **precludes any further award**.[91] The Court is not permitted to, and will not, speculate as to damages."[92]

Plaintiffs maintain that a 9 ft exterior wall measurement was appropriate to plug into Xactimate.  The Court found above that, by a preponderance of the evidence, Defendant established that the exterior wall height was 8 ft.  The Court is not permitted to speculate as to damages,[93] and the revised requested amount in damages remains erroneous and/or speculative.

Therefore, as a matter of law, Plaintiffs have failed to carry their burden and establish by a preponderance of evidence the specific amount of damages they are owed for the damaged sheathing.  As set forth above, "**failure to prove the specific, additional amount owed** under the SFIP **precludes any further award**."[94]

---

[90] *Yaniz v. Wright National Flood Insurance Company*, 446 F.Supp.3d. 1015, 1027-28 (S.D. Fla. 2020)(citing *Slater v. Hartford Ins. Co. of the Midwest*, No. 3:13-CV-345-J-34JBT, 2015 WL 1310984, at *7 (M.D. Fla. Mar. 24, 2015); *Mahood v. Omaha Prop. & Cas.,* 174 F. Supp. 2d 284, 293 (E.D. Pa. 2001); *see also Monistere v. State Farm Fire & Cas. Co.*, 559 F.3d 390, 398 (5th Cir. 2009).
[91] *Yaniz*, 446 F.Supp.3d at 1028 (citing *Mahood*, 174 F. Supp. 2d at 293)(emphasis added).
[92] *Id.* (citing *Mahood*, 174 F. Supp. 2d at 293)("**The court may not guess the reasonable price for repairs covered under the policy.**")(emphasis added)).
[93] *Id.* at 1028 (citing *Mahood*, 174 F. Supp. 2d at 293)("**The court may not guess the reasonable price for repairs covered under the policy.**")(emphasis added)).
[94] *Id.* at 1028 (citing *Mahood*, 174 F. Supp. 2d at 293)(emphasis added)).

For the foregoing reasons, judgment will be entered in favor of Defendant and against Plaintiffs.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 17th day of March, 2022.

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**